IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEIL WEINSTEIN, | No. C 06-04444 SI |
|     Plaintiff, | **ORDER DENYING DEFENDANTS' MOTION FOR A PROTECTIVE ORDER** |
| v. | |
| METLIFE INC., et al., | |
|     Defendants. | |

On October 6, 2006, the Court heard argument on defendants' motion for a protective order. Having considered the arguments of counsel and the papers submitted, and for good cause shown, the Court hereby DENIES defendants' motion for a protective order.

**BACKGROUND**

Plaintiff Neil Weinstein filed a complaint on July 20, 2006, alleging that defendants Metlife, Inc., Metropolitan Life Insurance Company, and Metlife Securities, Inc. violated section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), by failing to pay overtime to him and other similarly situated individuals. Plaintiff brings the FLSA claim on behalf of a purported nationwide "FLSA Class" of registered Financial Services Representatives ("FSRs"). Plaintiff also brings claims under Federal Rule of Civil Procedure 23 on behalf of a "California Class" of FSRs.

Around the time plaintiffs filed the complaint, plaintiffs' counsel contracted with Select Information Exchange ("SIE"), a company which collects and sells contact information of persons working in the securities industry, to obtain a list of contact information for persons fitting the class description outlined in the complaint. On or about August 1, 2006, plaintiffs' counsel used the list

provided by SIE to send a mass e-mail regarding this putative class action. The e-mail had the subject line of "MetLife Broker Class Action Lawsuit," and stated:

<u>The MetLife Lawsuit</u>:

On July 20, 2006, our law firm filed a class action against Metlife for (1) illegally charging current and former Series 6 and 7 representatives for items such as office space and support services, (2) failing to reimburse them for items such as supplies, business cards, etc., and (3) not providing overtime pay. In light of recent settlements (Smith Barney [$98 Million], Merrill Lynch [$37 Million], Morgan Stanley [$42.5 Million], UBS [$89 Million]), you can imagine that the dollar value of what MetLife may owe <u>you</u> is substantial.

*This is your money. We'd like to see you get it back.*

<u>Your Rights</u>:

If you worked as a Series 6 or 7 representative for either MetLife <u>or another financial services company</u> within the past 3 years and received either (1) commission only or (2) commission, plus a base salary less than $455 per week, you are entitled to overtime pay in addition to your full commission. Also, if you worked in certain states (e.g., California), you may be entitled to reimbursements for:

- Travel Expenses
- Overtime Pay for work beyond eight hours a day
- Telephone/Equipment Usage
- Marketing and Research expenses

<u>Get Involved and Get Paid</u>

Do not be surprised to discover that your company owes you overtime pay. Our law firm has fought for workers' rights for 14 years and has never once heard of a company that disclosed to its commissioned employees they were owed overtime pay. This fraud should end. Moreover, if you live in a state where expense reimbursements are required, you may recover those as well. No one likes working hard to make good money, just to give it back to the company.

Level the playing field at work and contact us to confidentially discuss your claim. There will be no obligation for you to do anything, except to become informed about how to recover your own money. Moreover, our lawsuit against MetLife is just the beginning; we are investigating numerous other financial companies, any one for which you may also have worked. Please contact us to assist in those investigations as well and to discuss how we can help you get back what you have, in fact, already earned.

Murray Decl., Exh. A. The e-mail was signed by plaintiffs' counsel Scott Cole, and included telephone and fax contact numbers, as well as a link to counsel's web site.

Cole sent the e-mails to both MetLife company e-mail accounts, and personal e-mail accounts. Once made aware of the e-mails coming through the company system, MetLife took action to block them; despite these efforts approximately 186 e-mails reached MetLife company accounts. The e-mails

reached a broad array of MetLife employees, throughout the United States.

Plaintiffs' counsel have also set up a "press release" regarding this case on their firm web page (www.scalaw.com). The web site also links to a "Consent Form," which the site describes as follows:

> Anyone working as a Series 6 or 7 representative for one of these MetLife defendants at any time after July 20, 2003 must file a Consent Form to be included in this case. While filing the Consent Form does not, by itself, guarantee a victory in this case or any particular recovery, your right to recover on your claims under federal law does not vest until this form is returned and submitted to the court. Moreover, every day you wait to return this form is one less day of recovery to which you may be entitled. To be included in this case, you must complete the consent form and return it to our office by facsimile, e-mail . . . or U.S. mail.

White-Sperling Decl., Exh. 2.

On August 22, 2006, plaintiffs filed 51 opt-in forms with the Court. After meeting and conferring with plaintiffs, on September 11, 2006, defendants filed the instant motion seeking a protective order that (1) prohibits plaintiffs from initiating any further contact with putative class members or the public concerning this issue, (2) orders plaintiffs to identify each individual who was sent the e-mail in question, and describe all communications or documents received from those recipients, (3) orders plaintiffs to identify each individual who was sent any other unsolicited communication about this litigation, (4) orders plaintiffs' counsel to remove all references to this action from their web site, and (5) prohibits plaintiffs' counsel from publishing further information about this litigation on the web. In the alternative, defendants seek an order disqualifying Scott Cole & Associates and the Law Offices of John M. Kelson from further representation of plaintiffs in this action.

**LEGAL STANDARD**

Under 29 U.S.C. § 216(b) "[a]n action to recover the liability [under FLSA] . . . may be maintained against any employer . . . by any one or more employees for and on behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." Thus unlike Federal Rule of Civil Procedure 23 class actions, FLSA class actions require plaintiffs to "opt in."

The Supreme Court has given the district courts broad discretion and responsibility to manage

3

the joinder of additional parties in FLSA class actions:

> Section 216(b)'s affirmative permission for employees to proceed on behalf of those similarly situated must grant the court the requisite procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rule of Civil Procedure. *See* Fed. R. Civ. P. 83. It follows that, once an ADEA action [(which are enforced using FLSA procedures)] is filed, the court has a managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way.

*Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989); *see also Does I Thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir. 2000) (holding that to facilitate the process of serving notice, "a district court may authorize the named plaintiffs in a FLSA collective action to send notice to all potential plaintiffs.").

While the district courts have broad power to approve proposed class notices in FLSA opt-in class actions, most courts have held that the parties need not seek court approval before contacting putative FLSA class members. For example, in *Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142 , 144 (4th Cir. 1992), a FLSA wage and hour case, the plaintiffs' counsel, with the help of a union, "circulated questionnaires and consent forms to" other employees of defendant, prior to any approval of notice by the district court. One of the fliers stated, in pertinent part: "You should know by now that a lawsuit has been filed on behalf of Farm Fresh employees to get back the money Farm Fresh has cheated you out of by making you work off the clock. . . . REMEMBER – YOU HAVE TO SIGN A CONSENT FORM, IF YOU HOPE TO GET BACK THE MONEY THAT FARM FRESH OWES YOU IF YOU WORKED OFF THE CLOCK." *Id.* at 144 n.2 (emphasis in original). The district court "took issue with the Union's involvement in securing the first 125 consents, suggesting that the Union may have misled some of the opt-in plaintiff with its 'inflammatory and misleading' flyers." *Id.* at 145. In response to this and other concerns, the district court disqualified plaintiff's counsel, struck 125 opt-in consents filed by plaintiff, and issued an order prohibiting plaintiff from contacting potential class members. *Id.* at 145-47. On appeal, the Fourth Circuit vacated the district court's orders. With respect to the prohibition on contacting putative class members, the circuit court stated:

> we can identify no reason for continuing the district court's ban on communication between [the plaintiff] and potential class members. The benefits of the class action provisions of § 16(b) "depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed

4

decisions about whether to participate."

*Id.* at 147 (quoting *Hoffman-La Roche*, 493 U.S. at 170).

Various district courts have reached similar holdings. In *Tucker v. Labor Leasing, Inc.*, 872 F. Supp. 941, 943 (M.D. Fla. 1994), for example, defendants in a FLSA overtime case brought a motion for sanctions against the plaintiffs, who had "sought unauthorized contact with employees of Defendants for the purpose of informing them of the lawsuit and persuading them to opt-in." Despite a local rule expressly forbidding communication to solicit potential class members, the district court denied the motion for sanctions, ruling that in a FLSA opt-in context, "section 216(b) does not require parties to obtain judicial approval before seeking to locate other 'similarly situated' persons . . . [I]t is not the court's role to prohibit plaintiffs from attempting to gather these consents." *Id.* at 949 (quoting *Garner v. G.D. Seale Pharmaceuticals & Co.*, 802 F. Supp. 418, 421 (M.D. Ala. 1991)).

A court in the Southern District of New York addressed an analogous case, where a union associated with the plaintiffs distributed at least two "Class Notices" soliciting participation in the lawsuit, without court approval. *See El v. Potter*, No. 01 Civ. 645, 2004 U.S. Dist. LEXIS 24447, at *1, 150 Lab. Cas. (CCH) P34, 945 (S.D.N.Y. 2004). Though the notices "were untimely and inaccurate," the court declined to bar opt-ins obtained through the non-approved outreach, stating:

> the FLSA, on its face, is silent on the issue of notice to potential class members. Moreover, the defendant has cited no authority for the proposition that if opt-in consents were improperly or illegally obtained, blanket cancellation of the consents is the appropriate remedy. It is significant that in *Hoffman-La Roche*, the Supreme Court declined to disturb the district court's rejection of the defendant's request to invalidate consents that were obtained and filed without court approval.

*Id.* at *33-34.

In *Taylor v. CompUSA, Inc.*, No. 1:01-CV-718, 2004 U.S. Dist. LEXIS 14520, at *1, 11 (N.D. Ga. 2004), a FLSA case, the district court denied defendant's emergency motion for a cease and desist order filed in response to an e-mail message sent to 27 CompUSA employees "notifying them of the action and their right to opt-in," and an e-mail "press release" sent to potential plaintiffs. The court held that plaintiffs "are not required to rely on court-facilitated notice to notify potential opt-in plaintiffs of the action." *Id.* at *11-12 (citing cases). The court was, however, "troubled by the fact that the messages contain factual and legal conclusions that may mislead potential plaintiffs" and therefore

5

prohibited plaintiffs from including "such unqualified, misleading statements in their communications with potential plaintiffs." *Id.* at *12.

Apparently, no district court in the Ninth Circuit has addressed a request to prohibit a plaintiff from communicating with potential class members in a FLSA case. Two district courts have, however, addressed whether a defendant may be so prohibited. In *Parks v. Eastwood Ins. Servs., Inc.*, 235 F. Supp. 2d 1082, 1083 (C.D. Cal. Dec. 3, 2002), a FLSA overtime case, "[b]efore the Court's notice was sent, Defendant sent to its prospective plaintiff sales agent employees an internal memorandum about the case. In particular, Defendant advised employees they could contact Defendant's general counsel to answer any questions they might have." In response, the plaintiffs filed an application to prevent the defendant from making such communications, and to make the defendant pay for a corrective notice. *Id.* The district court held: "Based on the provisions of § 216(b) and the similar Rule 23 pre-certification situation, the Court concludes there is no prohibition against pre-'opt-in' communication with a § 216(b) potential plaintiff, unless the communication undermines or contradicts the Court's notice." *Id.* at 1085.

In a similar case in this district, after the plaintiffs filed a FLSA action, the defendants issued a "Q&A document" about the suit to its managers and employees, some of whom were potential plaintiffs. *Gerlach v. Wells Fargo & Co.*, No. C05-0585, 2006 U.S. Dist LEXIS 24823, at *1, *17 (N.D. Cal. March 26, 2006). Noting that "pre-certification communications with potential collective action members are generally permitted," *id.* at *18 (citing *Gulf Oil v. Bernard*, 452 U.S. 89, 100 (1981)), the court found that the document was "not sufficiently misleading or coercive to justify" a prohibition on communication between defendants and potential class members, *id.* at *22.

In the context of Rule 23 "opt-out" class actions, the court's power to limit the parties' pre-certification contact with potential class members is similarly constrained. In *Gulf Oil*, the Supreme Court ruled that "a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. But this discretion is not unlimited, and indeed in bounded by the relevant provisions of the Federal Rules." 452 U.S. at 100 (citing case).

[A]n order limiting communications between parties and potential class members should

6

> be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. Only such a determination can ensure that the court is furthering,rather than hindering, the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23. In addition, such a weighing – identifying the potential abuses being addressed – should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

*Id.* at 101-02.

## DISCUSSION

Defendants argue that a protective order is necessary because plaintiffs' communications with potential class members "usurped" the Court's role in overseeing notice to the putative FLSA class, and violated California's Rules of Professional Conduct and anti-spam laws.

As the cases discussed above demonstrate, while the Court has the power to authorize notice of a pending FLSA action to potential class members, this power does not preclude plaintiffs from unilaterally initiating their own contact with similarly situated individuals. *See Hoffman-La Roche*, 493 U.S. at 170; *see e.g. Shaffer v. Farm Fresh*, 966 F.2d at 147. While none of these cases is controlling, in the absence of any contrary authority, several are directly analogous to this case, and the Court is persuaded by their logic. *See e.g. id.; Taylor v. CompUSA, Inc.*, 2004 U.S. Dist. LEXIS 14520, at *11-12.

At oral argument, defendants urged the Court to follow *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999 (11th Cir. 1997), and *In re: School Asbestos Litigation*, 842 F.2d 671 (3rd Cir. 1988), to find the e-mail inappropriate. Both cases are distinguishable from this case in several ways. First, both cases were Rule 23 class actions. As discussed above, FLSA class actions and Rule 23 class actions function differently, and accordingly, pre-certification communications are treated differently in each type of action. Furthermore, in *School Asbestos*, the district court issued an order requiring defendants to "prominently display a prescribed notice concerning the litigation whenever they communicate[d] in any manner with members of the plaintiff class or with any group reasonably believed to include a class member or representative of a class member." 842 F. 2d at 673 (internal quotation marks omitted). *School Asbestos* thus addressed the extent to which a district court may mandate communications to potential class members, not the extent to which the parties are free to make such communications on

7

their own. In *Motel 6*, the circuit court vacated a district court order authorizing pre-certification communications to potential class members. The circuit court's principal rationale for doing so was that the plaintiffs who sent the communications were not adequate class representatives. *See* 130 F.3d at 1004 ("Most important, the [] plaintiffs clearly could not properly be certified as class representatives."). The cases cited by defendants are therefore insufficient to overcome the multiple, analogous FLSA cases discussed above. Accordingly, the Court finds that plaintiffs' communication with potential class members regarding this suit was not, in and of itself, improper.

Defendants suggest that even if such communications are allowed, in this case a line was crossed, as both the content and mode of communication were inappropriate. The Court agrees that plaintiffs' freedom to communicate with potential class members is not completely unbridled. The cases discussed clearly allow non-court-authorized communications, but also suggest that not all forms of communication are appropriate. *See e.g. Gerlach*, 2006 U.S. Dist LEXIS 24823, at *1 (communications from defendants to potential class members may be prohibited if they are likely to be coercive or overly misleading); *Parks*, 235 F. Supp. 2d at 1085 (noting the requirement that the communications "not undermine or contradict the Court's own notice"). In this case, defendants argue that the emails were so misleading as to violate California Rule of Professional Conduct 1-400. The emails were also improper, defendants argue, because they violated federal and state anti-spam laws (the federal Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), and Section 17529 of the California Business and Professions Code).

CRPC Rule 1-400(D) prohibits communications that "(1) [c]ontain any untrue statement; or (2) [c]ontain any matter, or present or arrange any matter in a manner or format which is false, deceptive or which tends to confuse, deceive or mislead the public; or (3) [o]mit to state any fact necessary to make the statement made, in the light of the circumstances under which they are made, not misleading to the public; or (4) [f]ail to indicate clearly, expressly or by context, that it is a communication or solicitation, as the case may be." The Rule defines "communication" as "any message or offer made by or on behalf of a member concerning the availability for professional employment of a member or a law firm directed to any former, present, or prospective client." Rule 1-400(A). A communication "which contains guarantees, warranties, or predictions regarding the result of the representation" is

presumed to violate Rule 1-400. Rule 1-400(E), Standard 1. A communication, "except professional announcements, seeking professional employment for pecuniary gain, which is transmitted by mail or equivalent means which does not bear the word 'Advertisement,' 'Newsletter' or words of similar import in 12 point print on the first page," is also a presumed violation. *Id.*, Standard 5.

Defendants argue that plaintiffs' e-mail violated Rule 1-400 because it was "false and misleading" and "intrusive and vexatious," and violated the Rule *per se* because various statements "promise money and/or are a prediction of the outcome of the representation," and the e-mail fails to bear the word "advertisement" or "newsletter." *See* Mot. 9-10. The Court questions whether plaintiffs' e-mail was a "communication," as defined by Rule 1-400. Moreover, the Court is not persuaded that plaintiffs' e-mail was so misleading as to violate the Rule.

The CAN-SPAM Act, also allegedly violated by plaintiffs' e-mails, prohibits most unsolicited "commercial electronic mail message[s]," which the Act defines as "any electronic mail message the primary purpose of which is the commercial advertisement or promotion of a commercial product or service." 15 U.S.C. § 7702(2)(A). The Court questions whether plaintiffs' e-mail falls within the CAN-SPAM Act's definition of "commercial electronic mail message." Though the e-mail clearly potentially served the pecuniary interest of plaintiffs' counsel, its "primary purpose" was to notify potential class members of the case so that they could decide whether to participate. Moreover, in a world that increasingly relies on e-mail communication, the Court is troubled by the implication of defendants' argument: that plaintiffs may communicate with putative class members by handing out fliers, through face-to-face contact, via internal memoranda, or U.S. mail, but not through e-mail. *See Shaffer v. Farm Fresh*, 966 F.2d at 144 (fliers), *Tucker*, 872 F. Supp. at 949-50 (face-to-face contact); *Parks*, 235 F. Supp. 2d at 1082 (internal memoranda). In the absence of any caselaw or other authority suggesting that the CAN-SPAM Act applies to notices of putative FLSA class actions sent to a limited number of potential plaintiffs, the Court finds that the e-mail does not, on its face, violate the CAN-SPAM Act.

California's anti-spam law defines "commercial email advertisement" similarly, as "any electronic mail message initiated for the purpose of advertising or promoting the lease, sale, rental, gift offer, or other disposition of any property, goods, services, or extension of credit." Cal. Bus. & Prof. Code § 17529.1(c). The CAN-SPAM Act supercedes California's law, except those provisions of the

California law which prohibit fraudulent commercial email advertisements. *See* 15 U.S.C. § 7707(8)(1). As with the CAN-SPAM Act, California's definition of "commercial email advertisement" does not appear to cover the e-mail at issue here. Furthermore, as discussed above, the careless statements contained in the e-mail are not dangerously misleading, and do not rise to the level of being fraudulent. The Court therefore finds that plaintiffs' e-mail did not violate California's anti-spam laws.

Plaintiffs' e-mail clearly under-emphasizes the risks inherent in all litigation, and does not provide anywhere near a neutral evaluation of the merits of the case. Moreover, plaintiffs' counsel's past disciplinary problem does lead the Court to examine closely any alleged breaches of the public confidence. An overconfident tone and loosely selected diction are not sufficient, however, to warrant the drastic remedy of court intervention in communications between the plaintiffs and potential class members; communications which, as discussed at length above, are permissible.

The most sensible remedy for any confusion plaintiffs' e-mail might have caused would be to issue a court-approved corrective notice to all those who received plaintiffs' notice. Defendants, however, "<u>strenuously object to another notice in any form whatsoever being sent in this action at this time</u>." Reply 11:5-6 (emphasis in original). Defendants argue that doing so "would only turn up the spotlight on the false statements already made in Cole's e-mail and Cole's web site." *Id.* The Court disagrees, and is confident that the parties could successfully craft a corrective notice that presents a neutral description of the case and a realistic analysis of the risks and benefits of participating in it. Nonetheless, if defendants do not feel such a corrective notice is appropriate at this time, the Court will not force this remedy upon them.

Accordingly, the Court does not find that any remedial or preventative measures are necessary at this time. Both parties should bear in mind, however, that there is a very thin line between appropriate communications, designed to foster the goals of the FLSA class action mechanism, and misleading or coercive communications that undermine those goals and the public confidence in attorneys and the courts. Unqualified statements such as "[t]his is your money," "you are entitled to over time pay," and "your company owes you overtime pay," may lead recipients of the communication to expect a certain outcome from participation in this lawsuit. *See* Murray Decl., Exh. A Were the legal and factual issues as settled as plaintiffs' e-mail suggests, the parties would not be in litigation. Finally,

10

the parties should note that the Court will review with particular care any communications sent to putative class members by either party after any Court-approved notice regarding the case is issued. *See Parks*, 235 F. Dupp. 2d at 1085.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendants' motion for a protective order (Docket No. 14).

**IT IS SO ORDERED.**

Dated: October 11, 2006

SUSAN ILLSTON
United States District Judge